FRANCIS BROS. & JELLETT v. HEINE SAFETY-BOILER CO.

(Circuit Court of Appeals, Third Circuit. June 10, 1901.)

No. 29.

CONTRACTS—CONSTRUCTION OF CONTRACT TO FURNISH BOILERS—MODIFICATION OF SPECIFICATIONS.

A contractor for the construction of a building invited bids for boilers to be furnished in accordance with the specifications contained in its contract, but requiring bidders to furnish detailed specifications, describing the particular boiler they proposed to furnish. The successful bidder furnished such specifications, containing a guaranty; and they, together with the original plans and specifications, were attached to the contract subsequently signed, which provided that the owner's plans and specifications were understood as forming a part of the agreement, "except the changes in details of construction covered by" the proposal and specifications of the bidder. *Held*, that such contract was governed primarily by the owner's specifications, and that their requirements were superseded by the guaranty contained in the bidder's specifications only as to matters expressly covered by the latter, and as to which the two were inconsistent.

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

For opinion below, see 105 Fed. 413.

Frank P. Prichard, for plaintiff in error.

J. H. McNeal, for defendant in error.

Before ACHESON and GRAY, Circuit Judges, and BUFFINGTON, District Judge.

ACHESON, Circuit Judge. Francis Bros. & Jellett, Incorporated (here the plaintiff in error), had entered into a contract with Henry C. Lea, the owner of the Rittenhouse Building, on Arch street, Philadelphia, to do certain work required in the reconstruction of that building; the same to be done in accordance with plans and specifications which had been prepared by Francis Bros. & Jellett, and

adopted by the owner of the building. That contract included the furnishing and setting up of two water-tube boilers in conformity with the above-mentioned specifications. These specifications contained, among other things, the following provisions under the heading "Boilers":

"There will be two (2) new boilers erected in boiler room of new building, set singly as shown; each boiler having a capacity of one hundred and forty (140) nominal horse power, and must be capable of evaporating forty-two hundred (4.200) pounds of water from and at 212° Fahrenheit per hour, with ordinary firing.

"Proposals for water-tube boilers of the makes named only will be considered. Bidders are to furnish with their proposal detailed figures, plans for the boilers and setting and flue connections, including working drawings of the boilers, setting, and foundations, together with detailed specifications describing the particular boiler they propose to furnish. The general description of the boilers and their accompaniments must include the kind and quality of material to be used in the various parts of the boilers and their setting. They must also guaranty the number of pounds of water the boilers will evaporate per hour per pound of dry red ash anthracite pea coal, containing not over sixteen per cent. (16%) refuse, and when developing their normal horse power."

These specifications also contained the following provision under the heading "Tests":

"The boilers, when completed and ready for use, must stand a steam pressure of at least 125 pounds per square inch, and all local rules and ordinances affecting construction conformed to, after which they shall be operated for ten (10) consecutive hours to determine their maximum capacity, under the direction of the contractor furnishing the boilers. During the ten hours' test for maximum capacity, each boiler must show an equivalent evaporation of not less than 5,200 pounds of water per hour, from and at 212° Fahrenheit, with not to exceed 1½% of moisture in the steam.

"The test of the boilers to determine their economy shall be made during a second run of ten (10) consecutive hours. The test for economy must show an equivalent evaporation of not less than 10½ pounds of water per pound of combustible from and at 212° Fahrenheit; the boilers evaporating not less than 4,200 pounds of water per hour from and at 212° Fahrenheit.

"The tests for both economy and capacity will be made by the engineers, and their fees for making the test will be paid by the owner. Contractor for furnishing boilers must bear all other expenses, including coal, hauling of ashes, etc., for testing the boilers, both for maximum capacity and economy.

"Contractor must also guaranty to keep the boilers in repair, at his own expense, for a period of one (1) year from date of acceptance, when the necessity of such repairs is directly due to imperfect material or poor workmanship put upon said boilers, and must give bond, with approved corporate security, for the faithful performance of his contract and guaranty."

Francis Bros. & Jellett invited bids for these boilers from several boiler makers, including the Heine Safety-Boiler Company (here the defendant in error), referring the company to the plans and specifications above mentioned, and stating where they could be seen. The Heine Safety-Boiler Company, having first examined these plans and specifications, submitted a proposal with detailed specifications of the boilers they proposed to furnish inclosed in a letter dated April 10, 1899. Afterwards Francis Bros. & Jellett, Incorporated, signed a formal contract, and forwarded it to the Heine Safety-Boiler Company, to be executed by that company. To this contract were annexed the aforementioned specifications, upon which

the original contract between the owner of the building and Francis Bros. & Jellett, Incorporated, was based, parts of which specifications have been quoted above, and the first two paragraphs of the contract were as follows:

"This agreement entered into this first day of May, A. D. eighteen hundred and ninety-nine, by and between the Heine Boiler Company, of St. Louis, Missouri, party of the first part, and Francis Brothers & Jellett, Incorporated, a corporation of the state of Pennsylvania, party of the second part,

"Witnesseth, that for and in consideration of the payments and covenants herein mentioned, to be made and performed by the said party of the second part, the said party of the first part doth hereby agree and covenant to furnish all materials and apparatus for, and to build, construct, and finish complete, ready for use, two (2) water-tube boilers, with their setting, damper regulator, etc., called for in specifications prepared by Francis Brothers & Jellett, Incorporated, consulting engineers, dated March 15th, 1899, to be erected in the Rittenhouse Building, 707 & 709 Arch St., Philadelphia. The whole of said work is to be erected, constructed, and finished in conformity with the plans and specifications above referred to; both plans and specifications above referred to being understood as forming part of this agreement. All work called for by these plans and specifications is to be erected under the direction and supervision of Mr. Oliver Earnshaw, engineer for Mr. Henry C. Lea, owner of the building."

This contract was executed by the Heine Safety-Boiler Company, but in the paragraph just quoted an asterisk was placed at the word "agreement" where it last occurs, and another asterisk was put at the foot of the contract, where were added, just above the Heine Company's signature, these words: "Except the changes in details of construction covered by our proposition and specification dated 4/10/99 and attached hereto;" and the company attached to the contract and annexed specifications its proposal and specifications already referred to. Upon receipt of these papers, Francis Bros. & Jellett, Incorporated, under date of May 9, 1899, wrote to the Heine Safety-Boiler Company, requesting the latter to "specify what these changes in details of construction are," and in reply the Heine Safety-Boiler Company wrote thus:

"Answering your favor of the 9th, in which you ask what we mean by 'except the changes in details of construction covered by our proposition and specifications dated 4/10/99 and attached hereto,' would say that we refer simply to the minor details in which the construction of the Heine boiler differs from your general specifications, and these details are set forth in our specification sheet dated 4/10/99. For instance, especially in regard to the testing and inspecting of the metal, the punching and reaming of the rivet and tube holes, and the calking of the seams; also the guaranties which we make, and the amount of work which we include in our bid.

"This proposition of ours of the 4/10, with the modified price, is what you accepted, and naturally it should bear a prominent part in the total contract."

The specifications of the Heine Safety-Boiler Company, above referred to, contained a clause designated "Guaranty," which included the following provisions:

"We guaranty each boiler to be built of first-class materials throughout, and it shall be tested to 200 lbs. pressure before leaving the shop, and we insure it for one year.   *   *   *

"Either of these boilers will, when evaporating 4,200 pounds of water from and at 212° F. per hour, evaporate 9.0 pounds of water per pound of dry, newly-mined red ash anthracite pea or buckwheat coal, containing not more than 15% refuse (10.5 lbs. of water per pound of combustible); and

when using the same coal, and with ¾-inch draft at boiler damper, either boiler may be forced to evaporate 5,500 pounds of water per hour from and at 212° F. continuously, and at the same time not exceed 1% moisture in the steam at boiler valves.

"It is understood by us that the tests made to determine these guaranties are to be made by the engineers under our direction; the engineers' fees being paid by the purchaser, we simply furnishing the necessary coal and handling of the ashes, etc."

Such being the state of the contract relations between the parties, the Heine Company put two boilers into the Rittenhouse Building. These boilers (as the owner of the building alleged, and as the evidence in this record indicates was the fact) failed to fulfill the owner's specifications in three particulars, namely, neither of the boilers had a capacity of 140 nominal horse power, and neither of them was capable of evaporating 4,200 pounds of water from and at 212° Fahrenheit per hour with ordinary firing, as required in and by the above-quoted first paragraph of the clause, under the heading "Boilers"; and at the prescribed test the boilers did not develop the required maximum capacity. The owner of the building therefore rejected the boilers, and required Francis Bros. & Jellett to replace them with others, which was done. Thereupon this litigation arose, the parties bringing cross suits against each other in the court below; Francis Bros. & Jellett, Incorporated, suing for damages, and the Heine Safety-Boiler Company suing for the price of the boilers. The two cases were tried together, and in each case the verdict was in favor of the Heine Safety-Boiler Company, under the instructions of the court. The court instructed the jury that:

"The first paragraph of the clause under the heading 'Boilers,' and the related provision respecting 'tests,' in the contract as it was originally prepared, were wholly superseded, and that the only undertaking of the Heine Company regarding the capacity or capability of the boilers to be furnished by them, and the tests to be applied for the ascertainment thereof, is that which is contained in their own specification sheet, dated fourth month, 10th, 1899."

This instruction was fundamental, and, of course, was decisive against Francis Bros. & Jellett, Incorporated. Was it right? It is, we think, evident that the parties to this litigation had dealt with each other with mutual regard to the original contract between the plaintiff in error and the owner of the Rittenhouse Building, and with reference to the specifications for the boilers which the owner of the building had adopted, and which had entered into the primary contract. The Heine Company was invited to make a proposal upon the footing of those specifications. The clause under the heading "Boilers," it will be seen upon reference thereto, required that the proposal of bidders should be accompanied with "detailed specifications describing the particular boiler they propose to furnish." Manifestly the detailed specifications accompanying such a proposal were not intended to supersede altogether the owner's specifications. This was perfectly well understood by the Heine Company, as appears from its explanatory letter of May 10, 1899, relating to the interlineation at the foot of the agreement dated May 1, 1899, in which letter the company states:

"We refer simply to the minor details in which the construction of the Heine boiler differs from your general specifications, and these details are set forth in our specification sheet dated 4/10/99."

We are not, then, able to concur in the view expressed by the learned judge of the court below in his opinion overruling the motion for a new trial,—that the Heine Company's "proposal was an independent one." There was no refusal here to bid on the owner's specifications. The proposal was made under these specifications, notwithstanding there may have been some minor differences in details of construction and in the expressed guaranties between the two papers. The agreement dated May 1, 1899, which Francis Bros. & Jellett, Incorporated, and the Heine Safety-Boiler Company executed, after naming the specifications prepared by the former for the two boilers to be erected in the Rittenhouse Building, expressly provided that:

"The whole of said work is to be erected, constructed, and finished in conformity with the plans and specifications above referred to; both plans and specifications being understood as forming part of this agreement."

In view of this explicit stipulation, what effect is to be given to the interlineation, "except the changes in details of construction covered by our proposition and specification dated 4/10/99 and attached hereto," and the Heine Company's explanatory letter? We think that the interlineation and letter were not intended to nullify and should not be permitted to supersede any part of the original specifications with which they are not necessarily inconsistent. The several papers constituting the contract in its final form are to be read together. These papers constitute "the total contract," to borrow a phrase from the explanatory letter. Now, it is a cardinal rule of construction that effect should be given, if possible, to every part of an instrument. That rule is applicable here. It will be observed that the Heine Company's proposal and specifications do not make any mention of nominal horse power, or capacity under ordinary firing, nor do they treat at all of maximum capacity. In respect to the matters which are the subject of the first paragraph of the clause of the specifications of the owner of the building under the heading "Boilers," and the related provision touching "tests," the Heine Company's proposal and specifications are silent. There is therefore no inconsistency between those parts of the owner's specifications and the guaranties in the specification sheet of the Heine Company. They both can well stand together. The specifications of the owner of the building as to the nominal horse power of the boilers to be furnished, their capacity under ordinary firing, and their maximum capacity under test, concern matters of the first importance. They were fundamental provisions of the original contract for the work. Is it, then, to be believed that either of the parties to the subcontract intended thereby to supersede these essential requirements of the owner's specifications? Such a supposition, we think, is most unreasonable. We fail to find anything in this record to warrant the conclusion that so radical a departure from the primary contract was contemplated. By express terms, as we have seen, the original specifications were made

part of the subcontract. At the utmost, then, only a modifying effect is to be given to the interlineation and explanatory letter. The interlineation excepts "change in details of construction covered by our proposition and specifications"; and, when called upon to state what this means, the Heine Company writes to Francis Bros. & Jellett:

"We refer simply to the minor details in which the construction of the Heine boiler differs from your general specifications, * * * especially in regard to the testing and inspecting of the metal, the punching and reaming of the rivet and tube holes, and the calking of the seams; also the guaranties which we make. * * *"

The fair interpretation of this language regarding "guaranties," and the only allowable construction of it when read in connection with the other provisions of the contract, is that it refers to differences in the stipulations called "guaranties" in the owner's specifications and the specification sheet of the Heine Company. There are such minor differences. Thus the owner's specifications provided:

"They must also guaranty the number of pounds of water the boilers will evaporate per hour per pound of dry red ash anthracite pea coal, containing not over sixteen per cent. refuse, and when developing their normal horse power."

The Heine specification sheet stated, under the head of "Guaranty":

"Either of these boilers will, when evaporating forty-two hundred pounds of water from and at 212° F. per hour, evaporate 9.0 pounds of water per pound of dry, newly-mined red ash anthracite pea or buckwheat coal, containing not more than fifteen per cent. refuse."

The guaranty of capacity under forced draft, while adding to, is not at all inconsistent with, the owner's specifications. Besides, that guaranty was of no moment whatever, for the system of forced draft which each party had contemplated as a possible alternative construction was not adopted. Our construction of the papers constituting the contract between these parties gives reasonable effect to each and every part thereof.

The views we have expressed require a reversal of the judgment. The judgment of the circuit court is reversed, and the cause is remanded to that court, with direction to grant a new trial.